UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

GROVE US LLC,

                Plaintiff,

      v.                                  Case Nos. 13-C-677, 15-C-647

SANY AMERICA INC. and
SANY HEAVY INDUSTRY CO., LTD.,

                Defendants.

## DECISION AND ORDER

Plaintiff Manitowoc Cranes LLC, now Grove US LLC, initiated this lawsuit against Defendants Sany America Inc. and Sany Heavy Industry Co. Ltd. (collectively, Sany), asserting claims of patent infringement and misappropriation of trade secrets. *See* Case No. 13-C-677. The court stayed proceedings in the case on July 17, 2013, pending resolution of an investigation by the United States International Trade Commission (ITC). Manitowoc filed a second action against Sany on May 28, 2015, asserting a claim for tortious interference with contract. *See* Case No. 15-C-647. The court consolidated the cases on November 18, 2015, and continued the stay pending the resolution of the ITC proceedings. On December 7, 2016, the parties notified the court of the conclusion of the ITC proceedings and the resulting appeal. The ITC unanimously found that Sany had violated the Tariff Act by misappropriating Manitowoc's protectable trade secrets and infringing one of Manitowoc's patents, and entered both a limited exclusion order and a cease and desist order. ECF Nos. 66-3, 66-4. The ITC's decision was affirmed by the United States Court of Appeals for the Federal Circuit.

On December 20, 2016, the court lifted the stay and reopened the consolidated case. Manitowoc subsequently filed an amended complaint asserting only state law misappropriation of trade secrets and tortious interference with contract claims against Sany, over which this court has jurisdiction under 28 U.S.C. § 1332. Manitowoc also sought to recover damages that were not available in the proceedings before the ITC. Manitowoc then filed a motion for partial summary judgment, urging the court to adopt the ITC's findings regarding the misappropriation of Manitowoc's trade secrets and enter summary judgment against Sany's declaratory judgment counterclaims. On December 11, 2017, the court partially granted the motion to the extent that it found Sany liable for trade secret misappropriation under Wisconsin law. But the court allowed Sany to assert certain counterclaims against Manitowoc. ECF No. 81. The case is before the court on the parties' motions to exclude expert opinions. Manitowoc seeks to exclude certain opinions made by Daniel McGavock, and Sany seeks to exclude Brian Napper's opinions in their entirety. For the following reasons, both motions will be partially granted.

## SUMMARY OF DAMAGES OPINIONS

Manitowoc has named Brian Napper, a Senior Managing Director for FTI Consulting, Inc., as an expert witness who will offer opinions at trial on the damages associated with the misappropriation of trade secrets and tortious interference with contract by Sany. Napper's report identifies six separate categories of damages under two general headings he intends to address. Under the heading "Manitowoc Actual Damages," Napper lists (1) Manitowoc's "Incremental Performance Improvement Programs Expenses" (PIPS); (2) its "Incremental Legal Expenses;" and (3) its "Incremental Security Expenses." ECF No. 118-1 at 9.

2

PIPS expenses arise from the fact that in response to Sany's introduction of the SCC8500 crane to the market, Manitowoc contends it was forced to accelerate development of the Manitowoc MLC-650 and the Manitowoc MLC-300 cranes. This reduced the time Manitowoc would normally use to perform the type of prototype testing that would allow it to identify minor problems that would have been corrected before production is under way and the cranes reach the field. As a result of Sany's misappropriation of its trade secrets, Manitowoc contends, it incurred additional performance improvement costs for its MLC-300 and MLC-650 cranes. These, along with Manitowoc's incremental legal expenses related to the ITC proceedings, which it claims were incurred in an effort to mitigate its damages caused by Sany's misappropriation, and its incremental security costs, which it incurred after the misappropriation to prevent any further misappropriation, constitute Manitowoc's actual damages, which amount to $12,945,124.

In addition to its actual damages, Manitowoc contends that it is entitled to recover the amount by which Sany was unjustly enriched by the misappropriation. Under this heading, Napper lists (1) the amount of research and development costs Sany avoided from not adapting its 6500WE and/or 4800WE cranes for the United States market; (2) the amount of research and development costs Sany saved by using Manitowoc's trade secrets in developing the SCC8500 crane; and (3) the amount of incremental profit that Sany anticipated it would have generated at the time closest to the misappropriation, measured as Sany's Economic Value Added (EVA). Napper concluded Sany's unjust enrichment ranged from $73,976,693 to $111,875,507.

Sany's damages expert, Daniel McGavock, challenges the assumptions and methodologies underlying each category of damages Napper has identified. He opines that Napper has failed to demonstrate any actual damages to Manitowoc. In particular, he concludes that Manitowoc has not

3

established any lost sales of the MLC-650 or MLC-300 due to Sany's misappropriation of the trade secrets at issue, that there should be no damages awarded for Manitowoc's incremental PIPS expenses or for Manitowoc's security expenses, and that Manitowoc's incremental legal expenses should be reduced by at least $1,700,000—the amount of Manitowoc's patent-related fees. McGavock states that, assuming liability based on the ITC's findings and adopting Manitowoc's position that the SCC8500 would not exist in the absence of the misappropriation of trade secrets, Sany's actual profits on the sale of SCC5000E cranes derived from the SCC8500 prototype cranes is $1,723,246. Alternatively, he opines that Sany's unjust enrichment based on avoided costs associated with actual use of the trade secrets ranges from $1,283,852 to $1,533,488.

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 permits a witness "who is qualified as an expert by knowledge, skill, experience, training or education" to testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Expert testimony is admissible when the testimony is reliable and would assist the trier of fact to understand the evidence or determine a fact at issue in a case." *Lewis*, 561 F.3d

at 705 (citation omitted). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Id.* A district court has "wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 804 (7th Cir. 2012) (citation omitted). The rule on expert testimony is liberal, and doubts about the usefulness of an expert's testimony are generally resolved in favor of admissibility. *Davis v. Duran*, 277 F.R.D. 362, 366 (N.D. Ill. 2011) (citing *Krist v. Eli Lilly & Co.*, 897 F.2d 293, 298 (7th Cir. 1990); *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011)).

## ANALYSIS

### A. Sany's Motion to Exclude Brian Napper's Opinions

Sany raises a number of challenges to Napper's opinions and asserts that his report and testimony should be excluded in their entirety. First, Sany challenges Napper's opinions concerning the assessment of unjust enrichment damages. Sany asserts that Napper's opinion regarding Sany's hypothetical future profits is an irrelevant, unreliable, and inappropriate measure of damages for unjust enrichment. As an initial matter, the court notes that the underlying issue is one rooted in substantive law rather than in scrutiny of the merits of Napper's methodology. "[D]amages in an unjust enrichment claim are measured by the benefit conferred upon the defendant." *Ramsey v. Ellis*, 484 N.W.2d 331, 333–34 (Wis. 1992). In the context of misappropriation of trade secrets, courts look "to the time at which the misappropriation occurred to determine what the value of the misappropriated trade secret would be to a defendant who believes he can utilize it to his advantage, provided he does in fact put the idea to a commercial use." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 536 (5th Cir. 1974).

Sany argues that unjust enrichment damages may not be based on estimated profits and seeks to preclude Napper from presenting any testimony, opinions, or argument that references or relies on a presentation prepared by John Lanning, a Sany employee, regarding Sany's Economic Value Added (EVA) analysis of expected future sales and profits of the SCC8500 crane. Manitowoc argues that Napper is not using the hypothetical future profit figures to measure unjust enrichment; instead, he uses those figures to assess the value of the trade secrets at the time of the misappropriation. The difference is more than a matter of semantics. After reviewing Napper's report, it is clear that Napper is using future projections to assess the fair market value of the benefit conferred on Sany for purposes of ultimately measuring unjust enrichment. The issue, then, is whether future sales and profit projections can be used to assess unjust enrichment damages.

"Normally only the defendant's actual profits can be used as a measure of damages in cases where profits can be proved, and the defendant is normally not assessed damages on wholly speculative expectations of profits." *Id.* at 536; *see also Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 898 (E.D. Wis. 2010) (finding that "awarding a share of hypothetical future profits as a damages award for unjust enrichment is inappropriate"). Citing to the comments of § 51 of the Restatement (Third) of Restitution and Unjust Enrichment, Manitowoc asserts that parties may use future profit projections to determine the value of trade secrets and that it would be entitled to recover the value of the trade secrets even if Sany made no profit as a result of the misappropriation. *See* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 51(2) ("The value for restitution purposes of benefits obtained by the misconduct of the defendant, culpable or otherwise, is not less than their market value."). Manitowoc points to comment d of that section in particular, which provides:

6

> *Liability not less than market value.* The use of market value to fix a minimum liability in restitution is most often pertinent in cases involving conscious wrongdoers, but it applies to any case in which enrichment results from misconduct, with or without culpability, on the part of the defendant. Enrichment from benefits wrongfully obtained is not discounted to reflect some lesser value actually realized in advancing the purposes of the defendant. . . . So long as benefits wrongfully obtained have an ascertainable market value, that value is the minimum measure of the wrongdoing defendant's unjust enrichment, even if the transaction produces no ascertainable injury to the claimant and no ascertainable benefit to the defendant. Reasonable rental value or a reasonable royalty will often supply such a measure.

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 51 cmt. d. The Restatement suggests that enrichment from benefits wrongfully obtained should not be discounted when the benefits have an ascertainable market value and its illustrations reveal instances in which the market value is ascertainable:

> 7. By the legal tariff, a telephone call from the United States to Guyana requires payment to Guyana Telecom of 85 cents per minute. (U.S. carriers operating legally charge their customers at least $1.25 per minute, of which they remit 85 cents to Guyana Telecom.) Florida Telecom fraudulently transmits one million minutes of calls without payment to Guyana Telecom, charging its customers only 25 cents per minute. Damages from the fraud to Guyana Telecom cannot exceed $350,000, because originating in the U.S. Profits from the fraud to Florida Telecom cannot exceed its total revenues of $250,000. Florida Telecom is liable in restitution to Guyana Telecom for the market value of the benefit wrongfully obtained, or $850,000.

*Id.* Under the facts of the instant case, the benefits wrongfully obtained through the use of the misappropriated trade secrets are not as readily ascertainable as the benefit wrongfully obtained by computing the total Florida Telecom would have paid if it had charged its customers 85 cents per minute, rather than 25 cents. But the fact that the method of valuation is different does not mean that the principle does not apply.

Sany is free to challenge Napper's valuation of the trade secrets Sany misappropriated. It can argue, as it does here, that Lanning's projections of future profits were speculative and

7

unreliable, and thus do not provide a reasonable measure of their fair market value.  Sany can also point to the actual profit it arguably received from the use of Manitowoc's trade secrets, which was less than $2 million.  It can point out that whatever value the trade secrets might have had has been substantially reduced by the remedies Manitowoc has already received from the ITC, namely the cease and desist, and exclusion orders.  Sany has not shown, however, that Napper's opinion that one way to determine an asset's value is to consider the likely income the asset would generate is improper and not economically sound.  Its motion to exclude his opinion on the issue is therefore denied.

Sany also challenges the remainder of Napper's opinions regarding unjust enrichment damages as well as Napper's opinions regarding actual damages, arguing that those opinions are unreliable and irrelevant.  Napper opines that Sany was unjustly enriched by its avoided development costs which include: (1) the avoided development costs related to adapting its existing cranes for the U.S. market and (2) the avoided development costs related to developing the SCC8500.  In estimating Sany's avoided development costs, Napper used Manitowoc's total research and development costs for the MLC-300 and MLC-650 cranes as provided by Manitowoc and prepared a summary of those expenses.  ECF No. 118-1 at 99–100.  He then calculated labor rates at 33% of the United States' labor rates, a discount rate he obtained from Manitowoc, to account for China's labor rates.  *Id.* at 101–02.  Napper concluded Sany's avoided expenses from not adapting one or two cranes for the U.S. market ranged from $8,167,133 to $32,178,452 and its avoided expenses by using Manitowoc's trade secrets to develop the crane ranged from $8,167,133 to $22,054,628.

Napper lists three categories of actual damages: (1) Manitowoc's incremental PIPS expenses; (2) its incremental legal expenses; and (3) its incremental security expenses. As to the PIPS expenses, Manitowoc claims that, in response to Sany's introduction of the SCC8500 crane, which utilized Manitowoc's trade secrets, into the market, Manitowoc was required to accelerate the development of its cranes, resulting in increased PIPS expenses, that is, work performed to correct design flaws or other issues that were not caught during product development on cranes that have already been delivered to customers. Napper noted that Manitowoc tracked its PIPS expenses related to the Manitowoc MLC-650 and MLC-300 cranes and identified the level of PIPS expenses that were above and beyond its typical PIPS expenditures by comparing the costs related to those cranes with the PIPS costs incurred for its 16000 and 18000 cranes. In reaching his conclusion, Napper summarized a single document that was created by a Manitowoc employee. The document contained the total PIPS dealer warranty and parts costs for the MLC-650, MLC-300, 16000, and 18000 cranes as well as the PIPS labor hours and costs for the MLC-650 and MLC-300 cranes. Napper copied these numbers into his own chart, then subtracted the total dealer warranty and parts expenses incurred for the MLC-650 and MLC-300 cranes from those incurred for the 16000 and 18000 cranes to find the total incremental PIPS dealer warranty and parts costs for the MLC-650 and MLC-300 cranes. He then determined the ratio of 16000/18000 costs to MLC-300/MLC-650 costs, which equaled 35%. Next, Napper multiplied the total MLC-650/MLC-300 labor costs reflected in the Manitowoc document by the ratio to estimate the PIPS labor costs for the 16000/18000 cranes. He then subtracted the PIPS labor costs for the 16000/18000 cranes from the PIPS costs for the MLC-650 and MLC-300 cranes to determine total incremental PIPS labor costs.

He concluded the total incremental PIPS expenses for the MLC-650 and MLC-300 cranes totaled $4,532,666.

As to its legal fees and security expenses, Manitowoc maintains that the legal fees it incurred in the ITC action are recoverable as amounts spent to mitigate damages. After reviewing a source document provided by Manitowoc's counsel that summarized Manitowoc's legal expenses, Napper prepared an itemized summary of the legal expenses incurred. He reported that Manitowoc's legal expenses attributable to the ITC litigation total $7,360,630. *Id.* at 59, 95–96. In addition, Manitowoc claims that it incurred incremental security expenses following the misappropriation of the trade secrets. In his analysis, Napper assumes that Manitowoc would not have made the security improvements it made had it not been for Sany's misappropriation. He summarized the incremental security expenses Manitowoc incurred, and reported that those expenses totaled $1,051,828. *Id.* at 60, 97–98.

Sany asserts that Napper's opinions regarding Manitowoc's avoided development costs, incremental PIPS expenses, incremental legal expenses, and incremental security expenses fail to meet Rule 702's threshold relevance and reliability standards. In particular, Sany argues that Napper simply offers bottom-line conclusions about these categories of damages based on figures supplied by Manitowoc without independently verifying the accuracy and reliability of the underlying data and parrots numbers from documents that can speak for themselves. In calculating these damages, Napper merely added the amounts from the source documents or invoices provided by Manitowoc and did not provide an analysis or make his own independent determination of whether those amounts were reasonable or appropriate.

"Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (citing Fed. R. Evid. 702; Advisory Committee's Notes to 1972 Proposed Rule 702). Sany does not challenge Napper's qualifications, but contends that he is simply serving as a mouthpiece for Manitowoc's own personnel. Napper brings more to the case than simple repetition of Manitowoc's calculations, however. As a person with education and experience in valuation and financial consulting concerning companies' intellectual property, he is in a position to explain to the jury the kinds of impact the misappropriation of such property has on a business and the value such misappropriation provides to the company that misappropriates. A general knowledge of how businesses operate, i.e., the importance of trade secrets, the way businesses conduct research and development into new products, the costs of such research and development, performance improvement plans, and similar topics will help the jury understand the nature and basis of the damage claims Manitowoc is asserting. The fact that Manitowoc's own records and its own employees are the source of the amounts claimed is not grounds for excluding Napper's testimony to the extent it provides a framework for the presentation of Manitowoc's damage evidence in a coherent and organized manner.

Sany's concern that Napper's testimony may mislead the jury into believing that he performed a detailed and independent analysis of his own, to the extent it is not made clear on direct examination, can easily be dispelled on cross-examination. The argument that *Daubert* prohibits experts from offering such testimony because it is based on the financial records of the client company was soundly rejected in *Tuf Racing Products*:

The principle of *Daubert* is merely that if an expert witness is to offer an opinion based on science, it must be real science, not junk science. Tuf's accountant did not purport to be doing science. He was doing accounting. From financial information furnished by Tuf and assumptions given him by counsel of the effect of the termination on Tuf's sales, the accountant calculated the discounted present value of the lost future earnings that Tuf would have had had it not been terminated. This was a calculation well within the competence of a C.P.A.

*Id.* Here, too, Napper has relied on financial information provided by Manitowoc and Sany, as well as Manitowoc's attorneys, to formulate his opinions as to Manitowoc's actual damages and the benefit Sany received as a result of Sany's misappropriation. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 768 (7th Cir. 2013) ("The fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible."); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.").

Finally, Sany maintains that Napper's opinion regarding irreparable harm should be excluded. Equitable remedies are to be decided by the court, not the jury. In an effort to ensure that the jury is not misled by Manitowoc's irreparable harm evidence, the court will hold in abeyance its determination regarding equitable relief until after the jury resolves the issue of damages. *See Lacy v. Cook Cty., Illinois*, 897 F.3d 847, 858 (7th Cir. 2018) ("In order to protect parties' jury trial rights in these situations, courts typically submit the legal claims to a jury before the court decides the equitable claims." (citations omitted)). Accordingly, the court will exclude any evidence admissible solely on the issue of equitable remedies.

**B. Manitowoc's Motion to Exclude Daniel McGavock's Opinions**

Sany has named Daniel McGavock, Vice President of Charles River Associates in its Chicago, Illinois office, as an expert witness who evaluated potential damages associated with the misappropriation of trade secrets by Sany. Manitowoc asserts that McGavock's opinions should be excluded for several reasons. First, Manitowoc seeks to preclude McGavock from offering an expert opinion on the appropriate legal standards the jury should apply in this case. "Testimony is relevant if it helps the trier of fact in understanding the evidence or in determining a fact at issue." *Masters v. Hesston Corp.*, 291 F.3d 985, 991 (7th Cir. 2002). While an expert may provide an opinion as to the ultimate factual issues in the case, *United States v. Pansier*, 576 F.3d 726, 738 (7th Cir. 2009), he may not testify "as to legal conclusions that will determine the outcome of the case." *Good Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003); *United States v. Sinclair*, 74 F.3d 753, 757–58 n.1 (7th Cir. 1996) ("Federal Rules of Evidence 702 and 704 prohibit experts from offering opinions about legal issues that will determine the outcome of a case. That is, they cannot testify about legal issues on which the judge will instruct the jury."); *see also* 2 MICHAEL H. GRAHAM, HANDBOOK OF FEDERAL EVIDENCE § 704.1 (5th ed. 2001) (noting that experts are not permitted "to render an opinion as to questions which are matters of law for the court").

McGavock's opinion that "the 'anticipated' economic profits based on forecasts that never materialized is not proper, and are not a measure of unjust enrichment" is an inadmissible legal conclusion. Although Sany maintains that McGavock is simply explaining his understanding of the applicable law which serves as the legal framework for his expert analyses and economic opinions, this opinion is offered on an ultimate question of law, that is, which factors and evidence the jury

can consider in measuring unjust enrichment. The opinion encroaches upon the court's authority to instruct the jury on the law to be applied to the facts of the case. Because "[m]erely telling the jury what result to reach is not helpful to the jury," *Scottsdale Ins. Co. v. City of Waukegan*, 689 F. Supp. 2d 1018, 1023 (N.D. Ill. 2010) (quoting *Montgomery v. Aetna Cas. & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990)), the court will strike this legal conclusion from McGavock's report and bar his testimony pertaining to this opinion. This is not to say, however, that McGavock cannot note that the fact that the anticipated profits never materialized and challenge Napper's opinion as to the fair market value of the misappropriated trade secrets on the ground that Lanning's forecast was speculative, unreliable, and not a true measure of the value of the trade secrets.

In addition, McGavock asserts that Manitowoc's claim for incremental security costs as a form of actual damages "appears to contradict case law on the subject." To the extent McGavock's statement is an opinion, it is not a helpful one and is offered on a question of law, specifically, whether incremental security costs is an appropriate form of actual damages. Therefore, McGavock may not opine on this issue.

Manitowoc also maintains that McGavock cannot offer an opinion regarding the meaning and effect of Wis. Stat. § 134.90, Wisconsin's Uniform Trade Secrets Act. Citing to Wis. Stat. § 134.90(4)(a), McGavock explains that, "[f]rom an economic standpoint, a claim of actual damages based on increased costs or expenses should only include expenditures that were caused by the alleged wrongful conduct and should be offset by any additional economic benefits that were derived from such expenditures." ECF No. 112-1 at 43. Again, to the extent that this statement is an opinion, the types of actual damages that can be recovered under the statute is a question of law. While McGavock can testify about the factors he considered in calculating actual damages, he may

not offer testimony as to which evidence the jury can consider. The court will instruct the jury on what constitutes appropriate actual damages. *See United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) ("The 'expert' would have testified about the meaning of the statute and regulations. That's a subject for the court, not for testimonial experts." (citing *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994))); *see also George v. Kraft Food Global, Inc.*, 800 F. Supp. 2d 928, 932 (N.D. Ind. 2011) ("[E]xpert opinions that seek to define the meaning of statutes are disallowed under the Federal Rules of Evidence.").

Second, Manitowoc argues that McGavock offers an improper opinion on causation. Manitowoc alleges that, in response to Sany's introduction of the SCC8500 crane, which utilized Manitowoc's trade secrets, into the market, Manitowoc was required to accelerate the development of its cranes, resulting in the increased expense of PIPS. The analysis of plaintiff's expert, Brian Napper, assumes that the increased PIPS costs were caused by Sany's misappropriation. Manitowoc also asserts that, as a result of Sany's misappropriation, it was required to spend money on increased physical and computer security. Based on the assumption that these security expenses are attributable to Sany's misappropriation, Napper includes these expenses in his damages calculation.

McGavock indicates in his report that Napper's actual damages determinations are flawed and fail to establish causation to any reasonable degree of probability. He explained that Napper made "no attempt to test, verify, or corroborate the fundamental premise of causation underlying his PIPS analysis," simply "assume[d] that Sany was the sole cause of any acceleration," and did not analyze "whether any other market, competitive, staffing, or business management factors influenced the actual development timelines for the MLC-650 and MLC-300 compared to his benchmark cranes developed over a decade earlier." ECF No. 112-1 at 34. As to the security

15

expenses, McGavock concluded Napper had not "established a causal link between Sany's acts of misappropriation as defined by the ITC and Manitowoc's incremental expenses to improve security." *Id.* at 42.

Manitowoc asserts that these conclusions are improper opinions on causation and that McGavock is not qualified to make them. But McGavock's opinions and testimony rebut the analysis and conclusions of plaintiff's expert, such as his calculation of incremental PIPS expenses as well as his alleged failure to apportion and account for the value of Manitowoc's improved security. His use of different assumptions and methods does not warrant the exclusion of his testimony. As noted above, "[t]he fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible." *Stollings*, 725 F.3d at 768. "The reliability of such factual assumptions . . . is to be 'tested by the adversarial process and determined by the jury.'" *La Playita Cicero, Inc. v. Town of Cicero*, No. 11-cv-1702, 2017 WL 1151066, at *4 (N.D. Ill. Mar. 28, 2017) (quoting *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013)). McGavock offers proper rebuttal testimony that challenges the methodology and assumptions underlying Napper's opinions and will not be excluded.

Third, Manitowoc maintains that McGavock cannot offer opinions that contradict the ITC investigation factual findings. The ITC found, based on the testimony of Sany's Vice President in charge of Sany's crawler crane development during the relevant period that "Sany would have tried to adapt its 6500WE or 4800WE cranes for the United States Market." ECF No. 112-2 at 171. It explained that, because "those cranes are fundamentally unsuitable for this market, that effort probably would have failed." *Id.* The ITC concluded that, but for Sany's misappropriation, it would have entered the market with the unsuitable adapted cranes. It explained that "absent Mr. Lanning,

Sany would have entered the U.S. wind energy market with cranes that were unsuitable for those markets. By availing themselves of the Manitowoc trade secrets it learned from Mr. Lanning, Sany avoided what likely would have been a developmental dead end." *Id.* at 173.

Even though the ITC found that Sany would have tried to adapt its 6500WE or 4800WE cranes for the United States market but for Sany's misappropriation, McGavock opined that "the SCC4800WE and the SCC6500WE cranes are irrelevant to measuring Sany's unjust enrichment." He explained that the "notion that Sany would have incurred the cost to fully develop the repurposed SCC4800WE and/or the SCC6500WE cranes is completely unfounded because the record is clear that Sany would have, and did, reject the idea [to adapt the cranes] before incurring any development costs." ECF No. 112-1 at 49. He concluded that "the only avoided costs due to the misappropriation were those associated with developing the trade secrets as they existed at the date of misappropriation." *Id.* In calculating development costs, McGavock analyzed the costs that Sany avoided specifically related to the actual use of the trade secrets at issue. He found that Sany would have incurred additional development costs in the range of $1,283,852 to $1,533,488, absent misappropriation. McGavock's opinion that Sany would not have incurred development costs related to the 6500WE or 4800WE cranes contradicts the ITC's finding that Sany would have underwent development to adapt those cranes for the United States market. Sany cannot use an expert to contradict the ITC's factual findings. *See Cont'l Motors, Inc. v. Jewell Aircraft, Inc.*, No. 12-0221–WS-C, 2013 WL 5530842, at *6 (S.D. Ala. Oct. 4, 2013) (prohibiting expert from presenting opinions that conflict with the court's order); *Barban v. Rheem Textile Sys., Inc.*, No. 01-cv-8475, 2005 WL 387660, at *5 (E.D.N.Y. Feb. 11, 2005). The court therefore concludes that

McGavock is precluded from offering any opinion that is inconsistent with the ITC's factual findings, as that opinion would be unhelpful to the jury and result in jury confusion.

Fourth, Manitowoc asserts that McGavock's speculative opinions lack evidentiary support and are not a legitimate basis to dispute its claim of irreparable harm. McGavock opines that there is no reliable basis for Manitowoc to claim any actual damages, such as lost sales, caused by Sany's misappropriation. ECF No. 112-1 at 59. He indicates that "there are many factors that could have caused Manitowoc to miss their sales projections for the MLC 650 including, but not limited to, the boom bust cycle of the wind power market, differences in oil prices between the time Manitowoc was forecasting its sales and when they actually were selling the MLC 650, increased competition from other crane manufacturers, Manitowoc cranes tipping over, or poor forecasting by Manitowoc employees." *Id.* at 60. Manitowoc argues that none of these factors are supported by the record. Sany argues that McGavock is not opining that the factors did cause Manitowoc to suffer lower sales but rather illustrates what he believes are methodological flaws in Napper's opinion regarding lost sales. McGavock articulated which factors Napper should have considered and explained why the factors are relevant to the case. To the extent McGavock offers an opinion regarding these factors, Manitowoc can challenge the correctness of McGavock's conclusions through cross-examination and contrary evidence. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010) ("Determination on admissibility should not supplant the adversarial process; shaky expert testimony may be admissible, assailable by its opponents through cross-examination." (alterations and quotation marks omitted)).

Finally, Manitowoc contends that McGavock's apportionment opinions concerning the legal bills Manitowoc incurred in the ITC action are improper given his lack of legal training or other

relevant expertise. Manitowoc maintains that the legal fees it incurred are recoverable in their entirety as amounts spent to mitigate damages. McGavock opines that Manitowoc failed to "apportion its total ITC litigation expenses to account for the 'incremental' expenses associated with protecting and enforcing the Manitowoc trade secrets versus patents and other trade secrets that were asserted at the ITC but are no longer at issue in this case." ECF No. 112-1 at 39. In his report, McGavock reviewed the invoices Manitowoc received from its counsel and tabulated the expenses explicitly associated with patents. He found that Manitowoc's patent-related legal fees in the ITC investigation, totaling approximately $1.7 million, should be excluded from the damages calculation. Manitowoc asserts that McGavock was not qualified to parse through its legal bills to determine which tasks were and were not strategically relevant to the trade secret claims because this task is outside his area of expertise as an accountant. Separating costs found in time report entries falls within the realm of accountancy and is not outside McGavock's expertise. To the extent Manitowoc argues that McGavock's opinions are contrary to law, the legal question of what fees are recoverable is not currently at issue. Manitowoc can challenge McGavock's analysis and methodology through other evidence and cross-examination. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." (citation omitted)).

**C. Motions to Restrict Documents**

The parties have filed motions to restrict certain documents filed in conjunction with the parties' motions. Where confidential information is non-dispositive, or where documents contain

"trade secrets or other categories of bona fide long-term confidentiality," sealing may be appropriate. *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 547 (7th Cir. 2002). For instance, "documents containing sensitive pricing information, sales figures, sales dollar amounts, profit and loss data, and other financial records not normally made known to the public may be properly filed under seal." *Formax Inc. v. Alkar-Rapidpak-MP Equip., Inc.*, No. 11-C-0298, 2013 WL 2452703, at *1 (E.D. Wis. June 5, 2013) (citations omitted). It may be necessary to maintain a document under seal where public disclosures of the information would effectively afford "other firms an unearned competitive advantage—unearned because the issue of public disclosure arises from the adventitious circumstances of the [document's] having become caught up in litigation and as a result having become filed in court." *SmithKline Beecham Corp. v. Pentech Pharm., Inc.*, 261 F. Supp. 2d 1002, 1008 (N.D. Ill. 2003). The sealed exhibits and filings in this case reference confidential, non-public, proprietary, and competitive information regarding the parties' business operations. This information is worthy of confidentiality under Federal Rule of Civil Procedure 26(c)(1)(G). The motions to seal will therefore be granted.

## CONCLUSION

For these reasons, Manitowoc's motion to exclude improper opinions by Daniel McGavock (ECF No. 110) is **GRANTED-IN-PART** and **DENIED-IN-PART**. McGavock is precluded from offering legal conclusions and opinions that are inconsistent with the ITC's factual findings. Sany's motion *in limine* to exclude the opinions and testimony of Brian Napper (ECF No. 108) is **GRANTED-IN-PART** and **DENIED-IN-PART**. Napper is precluded from presenting any testimony or opinions that are relevant only to Manitowoc's request for equitable relief. In all other

respects, Sany's motion is denied.  Sany's motions to restrict (ECF Nos. 107, 114 & 119) are

**GRANTED**.  The documents will remain restricted to case participants.

      **SO ORDERED** at Green Bay, Wisconsin this  _28th_  day of February, 2019.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
